**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ERICA WILLIAMS, Individually, and as Administrator of the Estate of XAVIER McCORD, Deceased, | ) ) ) ) | |
| Plaintiff, | ) ) | 13-cv-8001 |
| v. | ) ) | Judge John Z. Lee |
| VILLAGE OF MAYWOOD, Officer MICHAEL BABICZ, Officer KYLE RICE, and Officer PETE SCHLEICH, | ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Erica Williams, individually and on behalf of the estate of her son, Xavier McCord, brings claims against the Village of Maywood and Maywood police officers Michael Babicz, Kyle Rice, and Pete Schleich under 42 U.S.C. § 1983 and state law. Defendants Village of Maywood and Officers Babicz, Rice, and Schleich have moved for summary judgment on all claims. For the reasons provided herein, the Court grants in part and denies in part Defendants' motion.

### Factual Background

The following facts are undisputed except where noted. On November 8, 2012, Xavier McCord met up with his friends, Keontac McKinney and James Bickhem. Defs.' Ex. 2, McKinney Dep. at 16–18. The three friends took a bus to an apartment building at 19th Avenue and Madison Street in Maywood to meet a fourth friend, Marshawn Moore. Defs.' Ex. 2, McKinney Dep. at 23–25, 31–33; Defs.' Ex. 3, Bickhem Dep. at 14–17. The group went to the apartment building almost every day to hang out and play games. Pl.'s Ex. 1, McKinney Dep. at

29–30; Pl.'s Ex. 2, Bickhem Dep. at 17. On this particular day, McCord did not enter the building with his friends, but he remained outside the rear door of the apartment building, texting. Pl.'s Ex. 1, McKinney Dep. at 26–27; Pl.'s Ex. 2, Bickhem Dep. at 16, 18.

Maywood police officers Michael Babicz and Kyle Rice were partners that day. Defs.' Ex. 4, Babicz Dep. at 8; Defs.' Ex. 5, Rice Dep. at 9. At approximately 4:30 p.m., they were passing the parking lot behind the apartment building. Pl.'s Ex. 3, Babicz Dep. at 12; Pl.'s Ex. 6, Rice Dep."), at 13. From their patrol car, the officers saw McCord, who was walking away from the building looking down at his phone. At that point, McCord purportedly looked up from his phone in the officers' direction and immediately turned around to enter the apartment building through the rear door. Pl.'s Ex. 6, Rice Dep. at 13.

Rice and Babicz exited their squad car, purportedly to conduct a field interview of McCord because of his "suspicious" conduct. Defs.' Ex. 4, Babicz Dep. at 13–14; Defs.' Ex. 5, Rice Dep. at 20. The officers do not claim that they observed McCord committing a crime or carrying a gun, and they do not suggest that they had probable cause to justify an arrest or reasonable suspicion to justify detaining McCord temporarily. Nevertheless, the Babicz and Rice decided to follow him into the apartment building.

Meanwhile, two other Maywood police officers, Peter Schleich and Lawrence Verpil, were driving by in their own patrol car and saw Babicz and Rice exit theirs. Pl.'s Ex. 4, Verpil Dep. at 12–13. Schleich and Verpil approached Babicz and Rice, who were standing on the corner, and asked, "You guys okay?" Pl.'s Ex. 7, Schleich Dep. at 12. Babicz and Rice answered, "Yeah, yeah. We're good." *Id.* Schleich and Verpil then drove away and headed southbound on 19th Avenue. *Id.* at 13. According to Verpil, as he and Schleich were driving away, he looked over his shoulder and saw Babicz and Rice running. Pl.'s Ex. 4, Verpil Dep. at 13. Over the

2

radio, he asked them, "What's going on? What's going on?" and "Hey guys, what have you got?" *Id.* But there was no answer. *Id.* Verpil then heard Babicz scream over the radio, "Shots fired, shots fired." *Id.* at 13, 15. At that point, Schleich activated his patrol car lights and returned to the apartment building. Defs.' Ex. 7, Schleich Dep. at 14.

Turning back to McCord, upon entering the apartment building, he told his friends that the police were "hot,'" meaning that police officers were patrolling the area. Pl.'s Ex. 1, McKinney Dep. at 32. A number of people were on the stairwell, so McCord walked up the stairs and stood on the second landing to talk to McKinney. *Id.* at 36.

About four minutes later, Babicz and Rice entered the building. According to McKinney and Bickhem, the officers entered with their guns drawn (or drew them quickly after entering) and began ascending the stairs after McCord, ignoring everyone else. Pl.'s SOAF ¶¶ 19–21; Pl.'s Ex 1, McKinney Dep. at 38; Pl.'s Ex 2, Bickhem Dep. at 29. Babicz and Rice dispute this account. Babicz testified that he drew his gun as he was running up the stairs after McCord (although it is not clear why), and Rice testified that he drew his gun after seeing Babicz do so. Defs.' Ex. 4, Babicz Dep. at 20; Defs.' Ex. 5, Rice Dep. at 24.

Babicz, who was ahead of Rice on the stairs, Defs.' Ex. 4, Babicz Dep. at 17–18; Defs.' Ex. 5, Rice Dep. at 22, testified that he saw a chrome handgun in McCord's right hand as he followed him up the stairs, Defs.' Ex. 4, Babicz Dep. at 20. When McCord reached the third floor, according to Babicz, he began to turn around, "raising [the gun] up a little bit." *Id.* at 22. Babicz ordered him to drop the gun[1] and then fired two rounds at him. *Id.* McCord fell to the floor, with his head in front of an apartment door. *Id.*

---

[1] That Babicz said "put the gun down" (or something to that effect) just before shooting is confirmed by McKinney and Bickhem. *See* Defs.' Ex. 2, McKinney Dep. at 63; Defs.' Ex. 3, Bickhem Dep. at 29.

3

According to Rice, he lost sight of McCord while ascending the narrow stairs, Defs.' Ex. 5, Rice Dep. at 24. But, after the shots were fired, Rice saw "a chrome plated semiautomatic handgun . . . bounce down the stairs and land[ ] on the second floor platform." Defs.' Ex. 5, Rice Dep. at 25.

Rice recounts that he quickly picked up the fallen gun in order to secure the scene. *Id*. at 26. Rice then contacted dispatch to report the shooting while Babicz handcuffed McCord. *Id.* at 28–30. The two officers then went outside. *Id.* at 28–30. Rice asked Babicz to turn over his service weapon, as is protocol when an officer has shot someone, but Babicz refused to do so until other officers arrived on the scene. *Id.*

Rice recalls that Schleich was the first other officer to arrive on the scene. *Id.* at 31. When additional officers had also arrived, Babicz gave his service weapon to Rice, at which point Rice placed it, along with the gun he purportedly recovered from the scene, into the trunk of their patrol car. *Id.* at 29-31. Once other officers arrived, Rice testified, he retrieved the recovered gun from his patrol car and put it back at the scene of the shooting. Defs.' Ex. 5, Rice Dep. at 34.

The accounts of Officers Schleich and Verpil differ from the accounts of Babicz and Rice. Schleich and Verpil testified that, when they first arrived at the apartment building, Verpil secured the rear door while Schleich went inside. Pl.'s Ex. 4, Verpil Dep. at 15; Defs.'s Ex. 7, Schleich Dep. at 17. Schleich saw Rice, still inside, "standing in the middle of the second set of stairs by a weapon." Defs.'s Ex. 7, Schleich Dep. at 18. Schleich then ran past Rice on the stairs to where Babicz was handcuffing McCord. *Id.* Verpil recollected that Babicz and Rice exited the rear door while he was standing there, but he does not recall seeing Rice with a gun in his hand when he exited. Pl.'s Ex. 4, Verpil Dep. at 15–17.

Schleich then went about securing the area. Defs.' Ex. 7, Schleich Dep. at 44. During that time, Schleich saw Rice approach the building with the gun. *Id.* Schleich testified that he asked Rice, "What are you doing?" to which Rice responded, "I have to put this back." *Id.* Schleich then asked, "What do you mean put it back? . . . Why did you take it in the first place?" *Id.* Rice replied that he had done so to secure the scene. *Id.* He then entered the building and placed the gun on the landing. *Id.* Schleich testified that it was improper for Rice to remove the gun from the scene; however, Schleich confirmed that the gun he saw Rice bring into the building matched the gun Schleich had seen on the stairs when he first arrived. *Id.* at 45–46, 61.

After Rice placed the gun onto the landing, the Illinois State Police Public Integrity Unit arrived to investigate the shooting. Defs.' Ex. 8, Thien Dep. at 19. State Trooper Krista Thien was assigned as the case agent. *Id.* at 19–20. While she was there, she learned that the gun had been removed and replaced (although she does not recall who had informed her of this). *Id.* at 38, 51. No fingerprints were obtained from the gun, and the gun could not be tied to McCord forensically in any manner. *Id.* at 41–45. After the conclusion of Thien's investigation into the shooting, the case was turned over to the Cook County State's Attorney, who declined to file criminal charges against Babicz. *Id.* at 72–73.

Plaintiff denies that McCord had a gun when he was shot. Pl.'s SOAF ¶ 23. Although McKinney and Bickhem could not testify with absolute certainty that McCord did not have a gun, McKinney insisted in his deposition that McCord would have told him if he had had one, and Bickhem explained that he had wrestled with McCord earlier in the day and did not feel a gun on McCord's person. Pl.'s Ex. 1, McKinney Dep. at 35–36; Pl.'s Ex. 2, Bickhem Dep. at 29.

Additionally, Denise Malone, who lived in the apartment building, testified that she went to her bedroom window soon after the shooting and saw a confrontation between two officers in

which one officer asked, "Why did you shoot, you know, we had the building surrounded, he couldn't go anywhere." Pl.'s Ex. 5, Malone Dep. at 10. This confrontation, she recounts, "almost really got physical," and a third officer had to intercede.[2] *Id.* at 10–11.

## Legal Standard

A grant of summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At summary judgment, the court considers the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in the nonmoving party's favor. *Liberty Lobby*, 477 U.S. at 255; *Woodruff v. Mason*, 542 F.3d 545, 550 (7th Cir. 2008). The Court must not make credibility determinations or weigh conflicting evidence. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010).

## Analysis

### I. Abandoned Claims

Defendants have moved for summary judgment on all claims pleaded in Plaintiff's complaint. In her response brief, however, Plaintiff has responded only to Defendants'

---

[2] Defendants object to Malone's testimony on hearsay grounds, pointing to her statement that the declarant was not a Maywood officer. *See* Defs.' Resp. Pl.'s SOAF ¶ 34. However, at the summary judgment stage, the Court must give the nonmovant the benefit of all reasonable inferences from the record. Here, Malone testified that the officer declarant appeared to be "in shock" and that the two officers "almost really got physical." *Id.* at 11. Moreover, the context indicates that the confrontation between the two officers took place almost immediately after the shooting. Accordingly, drawing all reasonable inferences in Plaintiff's favor, the statement at issue would qualify as an excited utterance under Fed. R. Evid. 803(2). That rule allows the admission of hearsay statements "relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." *Id.*; *see United States v. Boyce*, 742 F.3d 792, 798 (7th Cir.), *cert. denied*, 134 S. Ct. 2321 (2014) (concluding that statements during 911 calls about a domestic battery were admissible as excited utterances). What is more, despite Malone's recollection, the timing and substance of the statement suggests that the two arguing officers were Rice and Babicz, the only officers who were present at the time of the shooting, both of whom are parties to this action. Fed. R. Evid. 801(b)(2) (statement of party opponent not hearsay).

arguments directed at her Fourth Amendment claim against Officer Babicz and her *Monell* claim against the Village.

When a plaintiff fails to defend a claim in response to a motion for summary judgment, the Court may deem the claim abandoned. *See Maclin v. SBC Ameritech*, 520 F.3d 781, 788 (7th Cir. 2008) ("In her response to [defendant's] motion for summary judgment, [plaintiff] failed to defend her claim against these arguments. She therefore abandoned the claim."); *Palmer v. Marion Cty.*, 327 F.3d 588, 597 (7th Cir. 2003) ("[B]ecause [plaintiff] failed to delineate his negligence claim in his district court brief in opposition to summary judgment or in his brief to this Court, his negligence claim is deemed abandoned."). The Court therefore deems Plaintiff's unaddressed claims abandoned, with the exception of her state law claim against Babizc under the Wrongful Death Act, 740 Ill. Comp. Stat. 180/1, and her corresponding claim against the Village based on the doctrine of *respondeat superior*.

The reason for making an exception in the case of the Wrongful Death Act claim is that the claim is governed by a standard similar to the standard governing Fourth Amendment excessive force claims, meaning that the claims are likely to stand or fall together. *See Muhammed v. City of Chicago*, 316 F.3d 680, 683 (7th Cir. 2002). Although the two standards are not identical, *see Carter v. Chi. Police Officers*, 165 F.3d 1071, 1081 (7th Cir. 1998) (recognizing that conduct could be constitutionally unreasonable without necessarily being willful and wanton); *Medina v. City of Chi.*, 606 N.E.2d 490, 498 (Ill. App. Ct. 1992) (recognizing the reverse), in this case, Defendants' challenge to both of Plaintiff's claims relies on precisely the same disputed premise: that McCord was armed. And liability for the Village would flow from any liability for Babicz on the wrongful death claim because he undisputedly was acting within the scope of his employment when he shot and killed McCord. *See Vancura v.*

*Katris*, 939 N.E.2d 328, 343 (Ill. 2010) ("The employee's liability is imputed to the employer; that is, where the employee is acting within the scope of the employment, the plaintiff generally need not establish any malfeasance on the part of the employer.").

Regarding Plaintiff's abandoned "conspiracy" claim, the Court notes that, unlike Plaintiff's other abandoned claims, she does mention conspiracy in one line of her response brief, arguing that a reasonable jury could find that "Rice and Schleich conspired to conceal" Babicz's use of excessive force. Resp. Br. at 9. But Plaintiff does not indicate whether she is talking about a conspiracy in violation of state or federal law, and she cites no statute or case law about conspiracy. Perfunctory arguments unsupported by legal authority are insufficient to save a claim from summary judgment. *Argyropoulos v. City of Alton*, 539 F.3d 724, 738 (7th Cir. 2008).

Accordingly, Defendants' motion for summary judgment is granted as to the abandoned claims, and the Court will analyze only those claims that Plaintiff has defended in her brief in opposition to Defendants' motion. Because Plaintiff has abandoned all claims against Officers Rice and Schleich, they are dismissed as defendants.

## II. Excessive Force Claim

Plaintiff claims that Officer Babicz violated the Fourth Amendment's prohibition on excessive force when he shot and killed her son. A "police officer's use of deadly force constitutes a seizure within the meaning of that amendment and therefore is constitutional only if it is reasonable." *DeLuna v. City of Rockford, Ill.*, 447 F.3d 1008, 1010 (7th Cir. 2006) (citing *Tennessee v. Garner*, 471 U.S. 1, 7, 11 (1985)). Excessive force claims are analyzed under an objective reasonableness standard that asks "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). The Court must consider the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision

8

of hindsight." *Id.* at 396. The use of deadly force is permitted only if "the suspect poses a threat of serious physical harm, either to the officer or to others." *Garner*, 471 U.S. at 11; *see also DeLuna*, 447 F.3d at 1010 ("If an officer believes that the suspect's actions place him, or others in the immediate vicinity, in imminent danger of death or serious bodily injury, deadly force can reasonably be used."). "[I]f the suspect threatens the officer with a weapon that risk has been established." *Bell v. Irwin*, 321 F.3d 637, 639 (7th Cir. 2003) (internal quotation marks and citation omitted).

Defendants argue that summary judgment is warranted because, as they see it, there is no factual dispute undermining the reasonableness of Babicz's use of deadly force. *See* Mem. Supp. Summ. J. at 9–10. Babicz testified that he saw a gun in McCord's hand; Rice testified that he saw a gun fall onto the landing after Babicz shot McCord; and a gun was indeed recovered from the scene by a crime scene investigator. In Defendants' view, this evidence is uncontradicted, and the shooting was therefore justified. Alternatively, they argue that Babicz is entitled to qualified immunity. Mem. Supp. Summ. J. at 13–14. "Qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," *Williams v. City of Chi.*, 753 F.3d 749, 758 (7th Cir. 2013), and Defendants point out that no case has clearly established that a police officer violates the Constitution by shooting someone who is pointing a gun at him.

Plaintiff, however, denies that McCord had a gun, Pl.'s SOAF ¶ 23, and she has put forward evidence that creates a genuine dispute over whether he did.[3] That evidence includes the

---

[3] Defendants correctly point out that, read in isolation, Plaintiff's attempt to respond to certain paragraphs in Defendant's Statement of Material Facts with the phrase "Admitted as to this was Officer Rice's version of events" falls short of Local Rule 56.1's requirement that a party opposing summary judgment should include "specific references to the affidavits, parts of the record, and other supporting

9

testimony of McKinney and Bickhem, who said that McCord did not have a gun that day. *See* Pl.'s Ex. 1, McKinney Dep. at 35–36; Pl.'s Ex. 2, Bickhem Dep. at 29. It also includes the testimony of Malone, who witnessed a heated argument over the shooting between two police officers (who were likely Rice and Babicz based upon a reasonable inference from the record) with one shouting to the other, "Why did you shoot . . . he couldn't go anywhere." *See* Pl.'s Ex. 5, Malone Dep. at 10. Add to this the absence of McCord's fingerprints on the gun, *see* Defs.' Ex. 8, Thien Dep. at 41–45, along with the inconsistent testimony from the officers about the manner in which Rice handled the gun, *compare* Defs.' Ex. 5, Rice Dep. at 26 *with* Defs.' Ex. 7, Schleich Dep. at 44, and there is a genuine issue of material fact as to whether McCord was armed when he was shot.

Viewing the evidence in the light most favorable to Plaintiff, as must be done here, the Court concludes that there is sufficient evidence in the record from which a reasonable jury could find that McCord was unarmed when he was shot, which would mean (in this case) that the shooting constituted excessive force in violation of the Fourth Amendment. This conclusion also means that Babicz's argument for qualified immunity, which depends entirely on the assertion that McCord was armed, *see* Mem. Supp. Summ. J. at 13–14, must be rejected. Accordingly, summary judgment on Plaintiff's excessive force claim is denied.

## II. Wrongful Death Claim

Defendants argue that summary judgment should be entered on Plaintiff's claim under Illinois's Wrongful Death Act, contending that the claim is barred by the Local Government

---

materials relied upon" in contesting a stated fact. Local Rule 56.1(b)(3)(B). However, Plaintiff does provide these references in Plaintiff's Statement of Additional Facts, many of which directly contradict the assertions in Defendant's Statement of Material Fact. *Compare* Defs.' SMF ¶ 29 ("As Officer Babicz was running up the stairs following McCord, he observed McCord with a silver chrome handgun in his right hand.") *with* Pl's SOAF ¶ 23 ("Xavier [McCord] never had a gun. . . .").

Employees Tort Immunity Act, 745 Ill. Comp. Stat. 10/1-101, *et seq.* Defs.' Mem Supp. Summ. J. at 14–15. The Tort Immunity Act immunizes law enforcement officers from liability unless their actions were "willful and wanton," *id.* § 10/2-202, meaning intended to cause harm or highly likely to cause harm, *id.* § 10/1-210. Defendants deny that Babicz's actions could have been willful and wanton because, they assert, McCord threatened Babicz with a gun, justifying his use of force. Mem. Supp. at 14.

As explained already, however, a reasonable jury could conclude that McCord did not have a gun. Accordingly, Defendants' motion for summary judgment is denied as to Plaintiff's claim against Babicz under the Wrongful Death Act. The motion is also denied as to Plaintiff's corresponding wrongful death claim against the Village, because Babicz was acting within the scope of his employment when he shot McCord, meaning the Village faces potential *respondeat superior* liability. *See Brown v. King*, 767 N.E.2d 357, 360 (Ill. App. 2001) (Sheriff can be liable for unjustified shooting by deputy based on doctrine of *respondeat superior*).

### III. *Monell* Claim

Plaintiff claims that the Village of Maywood is also liable for the shooting under 42 U.S.C. § 1983. A municipality cannot be liable under § 1983 based on a *respondeat superior* theory, but, as first established in *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), a municipality can be liable under § 1983 if it caused the plaintiff's constitutional injury through "(1) the enforcement of an express policy [of the municipality]; (2) a widespread practice that is so permanent and well settled as to constitute a custom or usage with the force of law, or (3) a person with final policymaking authority." *Latuszkin v. City of Chi.*, 250 F.3d 502, 504 (7th Cir. 2001).

The Village argues that it is entitled to summary judgment on Plaintiff's *Monell* claim, asserting that Plaintiff has failed to present evidence demonstrating that the purported use of

excessive force was caused by any policy or practice of the Village. Mem. Supp. at 7–9. Plaintiff responds that she has presented evidence of such a policy, so-called "wolf packing," which Officer Verpil described in his deposition as officers moving in groups through the Village rather than sticking to the zone assigned to each two-officer unit. Resp. Br. at 9–10; *see* Pl. Ex. 4, Verpil Dep. at 32.

The Court agrees that Plaintiff has not presented evidence from which a reasonable jury could conclude that a Village policy or practice caused McCord's shooting. Even assuming that "wolf packing" was pervasive enough to constitute a policy or practice, Plaintiff makes absolutely no attempt to explain how wolf packing caused Babicz to use excessive force against McCord. Plaintiff has thus failed to meet her burden, and summary judgment must be granted to the Village on Plaintiff's Fourth Amendment claim.

## Conclusion

For the reasons stated herein, the Court grants Defendants' motion for summary judgment in regard to all claims except Plaintiff's claims against Officer Babicz under the Fourth Amendment and the Wrongful Death Act and Plaintiff's claim against the Village of Maywood under the Wrongful Death Act. Defendants Rice and Schleich are dismissed as Defendants in this action. A status hearing will be held on 9/27/16 at 9:15 a.m., at which time the remaining parties should be prepared to set deadlines for pretrial filings, a date for the pretrial conference, and a date for trial.

**IT IS SO ORDERED.**                                **ENTERED    9/13/16**

*[signature: John Lee]*

_____

**John Z. Lee**
**United States District Judge**